

FILED

06/09/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 18, 2017 at Knoxville

**STATE OF TENNESSEE v. JAMIE JONES**

**Appeal from the Criminal Court for Shelby County**
**No. 13-04061      Lee V. Coffee, Judge**

_____

**No. W2016-00491-CCA-R3-CD**

_____

The defendant, Jamie Jones, appeals his Shelby County Criminal Court jury convictions of felony murder and aggravated child abuse, claiming that the trial court erred by denying his motion to recuse, by permitting the State to amend the indictment, by admitting certain evidence at trial, and that the cumulative effects of these errors prevented him from receiving a fair trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark Mesler (on appeal), and André C. Wharton and Alexander Wharton (at trial), Memphis, Tennessee, for the appellant, Jamie Jones.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Eric Christensen, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In August 2013, the Shelby County Grand Jury charged the defendant with alternative counts of felony murder, one count of aggravated child abuse, and one count of aggravated child neglect, arising out of the death of the victim, the defendant's three-year-old son, L.S.[1] The trial court conducted a jury trial in August 2015.

_____

[1]      As is the policy of this court, we refer to minors by their initials.

The State's proof at trial showed that the victim's mother, P.S.[2], was fourteen years of age when the victim was born on October 4, 2009. From the time of his birth until December 26, 2012, the victim resided with P.S., his grandmother, R.S., and his aunt, C.S., in Hernando, Mississippi. According to C.S., the defendant, who resided in Memphis, would see the victim "periodically."

On December 25, 2012, the victim spent the entire day with his maternal family, and R.S. testified that he was "[h]ealthy" and "a happy little three-year-old." C.S. stated that the victim had no bruises, marks, or abrasions on his body when he fell asleep in her room that night.

When C.S. awoke the next morning, the victim and P.S. were gone. P.S. testified that the defendant had arrived at her residence early on the morning of December 26 and that she and the victim had left with the defendant while the rest of the family was still asleep. P.S. let the victim return to the defendant's residence for the next several days.

On January 1, the defendant arrived at the home of P.S.'s friend, Christina, with whom P.S. had been staying. When the victim got out of the defendant's car, P.S. noticed that the victim had a bruise on his forehead, and the defendant explained that one of his daughters had pushed the victim down some stairs. Shortly thereafter, C.S. arrived at Christina's house. C.S. observed the victim wearing only a diaper and noticed that the victim had a knot on his forehead just above his left eye. C.S. saw no other marks or bruises on the victim's torso, back, arms, or legs, but she did notice that the victim's lips were "very chapped" and that he had a small bruise on the inside of his lip. C.S. also believed that the victim appeared to be malnourished.

C.S. returned home and reported what she had seen to R.S. and her brother. C.S. and R.S. then returned to the residence where the victim was staying, but P.S. informed them that the victim was not there. C.S. and R.S. eventually located the victim at the home of the defendant's sister, where they found the victim dressed in girls' clothing because, as P.S. explained, he had defecated in his clothing earlier. Through the testimony of C.S., the State introduced into evidence a photograph taken of the victim at that time, which appeared to show a fairly large bruise or knot on the victim's forehead above his left eye. R.S. called the police, and both police officers and a social worker arrived at the house sometime later. After C.S. and R.S. had spoken with the police officers, they returned home without the victim. They never saw the victim alive again.

P.S. testified that, after her mother and sister had gone home, she took the

---

[2]      To protect the anonymity of the minor victim, we will refer to his maternal relatives by their initials as well.

victim to the hospital, at the direction of the social worker, to undergo a Computerized Axial Tomography ("CAT") scan. Following the CAT scan, the victim left the hospital with P.S. and the defendant, and the defendant eventually took the victim home with him while P.S. returned to Christina's residence. On January 8, P.S. took the victim to the Department of Children's Services ("DCS"). At that time, P.S. noticed that the victim had "little fingernail scratches on his face" that appeared to have been made by a child, and the bruise on his forehead was still present. Following the DCS meeting, the victim returned home with the defendant.

On January 14, the defendant's mother arrived at Christina's house; she was crying and told P.S. that they needed to go to the hospital because the victim had fallen "down the stairs" and was unresponsive. Shortly thereafter, C.S. received a call that the victim was unresponsive and had been taken to Le Bonheur Children's Hospital ("Le Bonheur"). Before C.S. made it to the hospital, P.S. called to inform her that the victim had died.

Matthew Balmut, a registered nurse in the emergency department at Le Bonheur, testified as an expert in the field of emergency room nursing. Mr. Balmut was working as the trauma nurse on January 14 when the victim arrived at the hospital shortly before 1:00 p.m.. Someone was performing cardiopulmonary resuscitation ("CPR") on the victim when Mr. Balmut first encountered him in the hospital lobby. The victim was transferred to a stretcher, and the nurse who had been performing CPR on the victim climbed onto the stretcher with the victim and continued CPR all the way to the emergency department. Mr. Balmut testified that from the time he first encountered the victim until the victim's death, the victim never had a heart rate and never breathed on his own. All attempts to resuscitate the victim failed, and the victim was pronounced dead at 1:34 p.m.

For close to three hours after the victim's death, Mr. Balmut remained with the body and examined the victim from "head to toe." Mr. Balmut described the victim's injuries:

> [I]n five and a half years I've never – this is, by far, the worst set of injuries I've ever seen, by orders of magnitude worse than anything I've ever seen. I saw present, essentially, from head to toe, everything from his feet to his hands. His scrotum was bruised. He had what looked to me like burns across his head that looked like a friction burn, like when you get a carpet burn on your knee when you're a kid.

When asked if the victim's injuries could have been caused by a fall down a set of eight stairs, Mr. Balmut responded as follows:

> No, sir. Impossible. I guess anything is possible, but I don't see any way at all that these injuries could be caused by any number of falls of any height whatsoever. I've seen kids that have jumped off of bunk beds. I've seen kids that have come off of second, third floors of apartment buildings. I've seen kids that were ejected from a moving vehicle on the interstate and tumbled down a highway for a hundred-plus feet, and none of them had injuries nearly as severe – nothing near as severe as the injuries that he came in with.

Mr. Balmut also recalled that the victim "had maybe [50] puncture wounds on his lower abdomen, pelvis, flank area that looked like they had ink, like – almost like if you just took a ballpoint pen and just sat there and just – and like stabbed somebody with it." Mr. Balmut denied that the victim's bruises were the result of resuscitative efforts. Mr. Balmut testified that the victim's injuries were "the worst thing [he'd] ever seen in years of working" at the hospital and opined that the injuries were the result of child abuse.

Doctor Camilla Forsythe, a pediatric emergency physician at Le Bonheur, testified as an expert witness in the area of pediatrics and pediatric emergency medicine. Immediately upon seeing the victim on January 14, Doctor Forsythe knew that he "was a victim of trauma" based on "the distribution of wounds on the face and on the extremities." Doctor Forsythe noted that the victim, who was in full cardiac arrest when he arrived at the hospital, had "some form of burn on his face" along with "extensive" bruising on his face, his trunk, and his extremities. Doctor Forsythe learned from a social worker and from the defendant that the victim had allegedly "fallen down the stairs" earlier in the day and that the defendant had brought him to the hospital "to have him checked out." Doctor Forsythe had "never, ever seen a child fall down even a flight of stairs with the extent of bruising that" the victim had, recalling that the victim even "had a bruise on the tip of his penis."

When the victim was brought to the emergency department from the hospital lobby, his body temperature was significantly lower than average, which suggested to Doctor Forsythe that the victim's circulation "had paused for a period of time that was longer than just getting from" the hospital lobby to the emergency department. Taking both his low body temperature and low lactic acid levels into account, Doctor Forsythe opined that the victim had had poor circulation for over an hour. In addition, the victim had no reaction to pain stimuli, no gag response, and his

pupils were fixed and dilated. Doctor Forsythe opined that the victim died "of nonaccidental trauma" as the result of a "beating."

When Doctor Forsythe informed the defendant and P.S. that the victim had died, P.S. was "extremely upset," but the defendant said nothing. When Memphis Police Department ("MPD") Officer Michael Tippett informed the defendant that he would be taking him from the hospital to the police department for an interview, the defendant was "emotionless."

The defendant's wife, Teairra Jones, recalled seeing "three bumps" on the victim's head around January 1 and stated that the defendant had told her that the victim had fallen down the stairs. On the morning of January 14, the defendant drove Mrs. Jones to work, and he then returned home to watch the victim and his two young daughters. Shortly after noon, the defendant called Mrs. Jones:

> He told me that [the victim] had fallen and that he couldn't get him to respond. He did take him a bath, and he laid him down, but he couldn't get – when he fallen, he took him a bath, and when he laid him down, he couldn't get him to wake up.

> I was like, "Well, Jamie," I was, like, "Get him to the hospital." And he was, like, "Okay, I'm going to have to take him to the hospital."

Mrs. Jones asked a co-worker to drive her to the hospital, and while en route, she spotted the defendant's car and flagged him down. She then got into the defendant's vehicle and saw the victim, who was "laying there" and "kind of making a little noise." The victim's eyes were closed, and Mrs. Jones was unable to tell whether the victim was breathing or had a pulse. According to Mrs. Jones, the defendant began "vomiting everywhere" when the doctor informed them that the victim had died. Mrs. Jones confirmed that the victim was "fine" when she left for work on the morning of January 14, and, with respect to post-mortem photographs of the victim, she testified that the victim had multiple bruises that she had not seen earlier in the day.

MPD Crime Scene Investigator J.R. Rector photographed the defendant's residence and testified that the exterior of the defendant's apartment complex had eight steps leading to a landing, followed by eight additional steps leading to the defendant's second-floor, two-story apartment. Photographs of the apartment's interior revealed what appeared to be fecal matter smeared on a hallway wall leading to the downstairs bathroom and an indentation on the wall opposite the fecal matter. On the second floor

of the apartment, Officer Rector photographed a blue towel located in the hallway floor just outside the upstairs bathroom, and he stated that "the towel and the floor beneath it had been soiled with fecal matter." Officer Rector testified that the blue towel was wet when he collected it on January 14. A photograph of the apartment's interior staircase depicted at least nine carpeted stairs.

Doctor Karen Chancellor, Chief Medical Examiner for Shelby County, performed the victim's autopsy and testified as an expert witness in the field of forensic pathology. Through Doctor Chancellor's testimony, the State introduced into evidence 41 photographs depicting the following injuries to the victim's body: bruising on the back of his head; bruising and abrasions on the top of his head; bruising on the right side of his head; a bruise on his left cheek; an abrasion and a small scratch around his left ear; multiple areas on the victim's forehead, nose, upper lip, chin, and below his right eye where the "top layer of the skin has been removed" likely due to a "burn or chemical type burn"; a half-inch scratch or abrasion on his lower right side of his face; bruising and a laceration on the inside of the victim's lower lip; a large abrasion underneath the victim's chin; a large bruised area on the right side of the victim's neck; multiple scratches on the back of the victim's neck; a two-inch bruise on the back of the victim's right shoulder; multiple bruises on the back of the victim's left shoulder; a large, rectangular area of bruising just below the right side of the victim's ribcage "which could [have] be[en] caused by a part of a shoe" as well as multiple smaller bruises on the right side of the victim's torso; several smaller bruises on the left side of the victim's torso; multiple bruises extending from the victim's right shoulder to the upper arm to the forearm to the hand; multiple bruises extending from the victim's left shoulder to his upper arm to his forearm, as well as scratches and abrasions on his left arm; "large areas of bruising" on both the right and left sides of the victim's back, in addition to scratches on his back; the buttocks and back of the upper thigh area, which was "just one large area of bruising"; two bruises on the back of the victim's right knee; bruising on both of the victim's inner thighs; bruising on the victim's upper right thigh; bruising on the tip of the victim's penis; bruising on both of the victim's lower legs; multiple bruises on the victim's lower right quadrant; a large area of bruising on the victim's right hip; "tiny abrasions" on the victim's right hip which would have been caused by a "blunt object"; three lacerations to the victim's liver "caused by blunt force of the abdomen" and which led to internal bleeding; severe injuries to the victim's adrenal glands, which are located above the kidneys and are "situated deep inside the body" and which injuries resulted in the right adrenal gland, located just behind the liver, being torn into two pieces; and hemorrhaging of the bowel mesentery.

Doctor Chancellor estimated the victim's total blood loss due to internal bleeding to be more than 25 percent of the total amount of blood in his body. With respect to the large, rectangular bruise below the victim's right ribcage at the site of his

liver, Doctor Chancellor opined that the amount of damage caused to the liver and right adrenal gland must have been caused by "[a] great deal of force" that could not have occurred from the victim's falling down a flight of stairs, nor could the victim's facial burns or penis injury have been caused by a fall. Doctor Chancellor testified that the victim's extensive injuries were not accidental in nature, and she estimated that the victim had a minimum of 116 bruises on his body. Doctor Chancellor clarified that she "did not find a difference in the ages of the injuries" to the victim's body, explaining that her review of the bruises under a microscope revealed "fresh hemorrhage" indicating that all bruises were "of a similar age."

Doctor Chancellor opined that the victim's death was caused by multiple blunt force trauma and that the manner of death was homicide.

MPD Sergeant Mundy Quinn interviewed the defendant on the afternoon of January 14. When Sergeant Quinn entered the interview room, the defendant was asleep with his head on the table. Sergeant Quinn provided the defendant with *Miranda* warnings, and the defendant executed a written waiver of his constitutional rights. The defendant told Sergeant Quinn that he had driven Mrs. Jones to work that morning and that he had then returned to his residence and prepared breakfast for his daughters and the victim. At some point, the defendant was helping one of his daughters, and he told the victim "to go ahead and go down to the car." Shortly thereafter, he heard the victim crying, and the defendant discovered the victim "at the bottom of the steps with blood all over him." The defendant then corrected himself, stating that the victim was *not* crying, and that, instead, the victim was unconscious but began to cry when the defendant picked him up. The defendant explained that he brought the victim upstairs to give him a bath because he had defecated on himself. Following the bath, the defendant realized that the victim "wasn't acting like himself," so he decided to take him to the hospital. When Sergeant Quinn asked the defendant why he had not called for medical assistance, the defendant responded that "he didn't think about it." The defendant also explained that he did not seek help from a neighbor because, in Memphis, "you don't knock on someone's door." Sergeant Quinn testified that the defendant provided this narrative in a "carefree" manner, devoid of emotion. The defendant never mentioned putting the victim down for a nap.

The defendant told Sergeant Quinn that, while en route to Le Bonheur, he "stopped on South Parkway and called his wife and mother." The defendant insisted that the victim was talking and "saying, 'Da-Da'" during the ride to the hospital.

Sergeant Quinn confronted the defendant with the extent of the victim's injuries, showing him photographs of the victim's facial injuries, as well as bruising to the front and rear torso, and asking if any of the injuries had occurred on a prior occasion.

The defendant insisted that all of the victim's injuries had occurred on January 14. Sergeant Quinn testified that the rectangular bruising on the right side of the victim's torso showed a specific pattern that was consistent with the athletic shoes the defendant was wearing. Sergeant Quinn also stated that "[t]here was no blood found on the stairs or the platform where [the defendant] said" he found the victim covered in blood.

With respect to discrepancies in the defendant's statements, Sergeant Quinn recalled that the defendant, in his oral statement, claimed that he had called his wife and met her at a gas station on South Parkway but that in his written statement, the defendant stated that he had called his wife from a gas station at Raines and Millbranch before meeting her on South Parkway. In addition, the defendant told Sergeant Quinn in his oral interview that he had failed to call 9-1-1 because it did not occur to him, but in his written statement, the defendant claimed that he did not call for emergency services because he did not have a telephone. Sergeant Quinn noted that the defendant had provided a telephone number at the outset of his interview.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant elected to testify.

The 28-year-old defendant testified that, prior to December 26, 2012, he had custody of the victim "on occasion[]," stating that a dispute between R.S. and him resulted in the necessity of his visiting the victim at R.S.'s residence. The victim began staying with him on December 26, and he had primary custody of the victim until the day he died. According to the defendant, he drove Mrs. Jones to work on the morning of January 14, and their two daughters, who were ages three and one at the time, and the victim accompanied them. The foursome then returned to the apartment, and the defendant was preparing to take all of the children to meet P.S. at 10:30. While the defendant was getting the children ready, the one-year-old told the defendant that the victim had defecated on himself, and the defendant described what happened next:

> [S]o I got upset and told [the victim] that I was going to discipline him, because he know better.
>
> So, I ended up taking [the victim's] clothes off, and I grabbed the blue towel that they displayed, and I cleaned him. I told my oldest daughter to go get [her] belt. . . . And [she] brought the black belt to me, and after I finished cleaning [the victim], I struck him across the back twice, and [the victim] ran out of the bathroom.

As [the victim] was running, [the victim] hit his right shoulder on the wall coming out of the bathroom. As he got up, he ran into the master bedroom. And he ran into the master bedroom, and he rolled across our bed – our bed, and I struck him three or maybe four more times.

The defendant clarified that the victim had not had a bath yet and that he was naked. The defendant then continued:

I'm not sure if that's where [the victim's] penis was injured or not. Honestly, I do not, I don't remember seeing [the victim's] penis. But if it happened, that's where it happened at. [The victim] got – he rolled out of bed, and to this day, I don't know if [the victim] thinks that I was – I don't know if he think I was playing with him, or if he thought that – you know, to this day, I just don't – I don't know what he was thinking, you know.

And he was smiling at me, but he was crying, also, at the same time, and I'm chasing him, and he ran out of the room, and he fell down the stairs in the house, and I don't know what caused [the victim] to fall. I don't know. To this day, I still don't know. And when he made it to the bottom of the stairs, [the victim's] face was bruised really bad, and I chased him.

Then, when I got down stairs, he thinking that I was still chasing him, but, actually, I was trying to see what was wrong with [him], and [he] ended up going in my downstairs bathroom. He's still naked, you know, and he's very bruised up.

And I went to attend him, but I didn't know [the victim] had defecated on himself. In the pictures that the State showed to you about the downstairs bathroom where the defecation was, I ended up picking [the victim] up, not knowing that he had defecated, and dropped him, and that's how the [feces] ended up being on the wall.

. . . .

- 9 -

I did not go to the store to make a phone call. I had a phone. And I called my wife and told my wife that [the victim] had fell, and he's not breathing, and I told her that I tried CPR, not knowing that I don't know how to do it, and he wasn't responding, so I told her I was going to rush him to the hospital.

She told me to give her five to ten minutes and that she would meet me at Millbranch and Raines store when I was headed to the hospital. So, I took [the victim], rushed to clean him up, rushed to put his clothes back on, and rushed him to the hospital.

I met my wife on Millbranch and Raines and rushed to Le Bonheur.

The defendant denied a lack of emotion upon learning of his son's death, insisting that he had vomited upon hearing the news and that he had sat on the floor, rocking back and forth. The defendant also denied that he was asleep when Sergeant Quinn came in to interview him.

With respect to his police interview, the defendant testified that Sergeant Quinn was "[v]ery rude, very disrespectful" and that "he kn[e]w for a fact that he [was] going to get a murder charge put on" the defendant. The defendant explained that he was dishonest when he gave his statement to Sergeant Quinn because he "didn't want to lose [his] life behind a mistake" and that he "tried to cover up [his] wrongdoing at the time" he gave his statement. The defendant also stated that he was "very lightheaded" and that his stomach was "weak" during the interview.

The defendant admitted that he had caused the victim's death, but he insisted that "those were not [his] intentions that day." The defendant denied striking the victim with a shoe or stomping, punching, kicking, stabbing, or biting him.

On cross-examination, the defendant admitted that, in January 2011, the one-year-old victim had spent the weekend with him and that when the defendant brought the victim to daycare at the end of the weekend, the victim had abrasions under his eye and behind his ear and scratches on his arms and legs. As a result of these injuries, the defendant was no longer welcome in R.S.'s home.

The defendant conceded that his three-year-old daughter had pushed the victim down four carpeted steps in his apartment on January 1, which caused the bruise

and knot on the victim's forehead. The defendant claimed that he had spanked the victim three to four times on his buttocks and back on January 13 for defecating on himself and that the spanking had caused some of the bruises on the victim's body that were discovered on January 14.

On rebuttal for the State, MPD Lieutenant Alisa Mitchell testified that when she accompanied Sergeant Quinn into the interview room on January 14, the defendant's head was down and he was asleep.

Based on this evidence, the jury convicted the defendant as charged of one count each of felony murder in the perpetration of aggravated child abuse, felony murder in the perpetration of aggravated child neglect, aggravated child abuse, and aggravated child neglect. The trial court merged the felony murder convictions and imposed an automatic sentence of life imprisonment. Following a sentencing hearing, the trial court merged the aggravated child neglect conviction with the aggravated child abuse conviction and imposed a sentence of 25 years to be served at 100 percent service by operation of law and to be served consecutively to the defendant's life sentence for an effective sentence of life plus 25 years. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by denying his motion to recuse, by permitting the State to amend the indictment, by admitting certain evidence at trial, and that the cumulative effects of these errors prevented him from receiving a fair trial. Although the defendant does not challenge the sufficiency of the evidence at trial or raise any claims related to his sentencing, we find the evidence adduced at trial overwhelmingly supports the defendant's convictions of felony murder, aggravated child abuse, and aggravated child neglect, and that the record fully supports the sentence imposed. We will now address each of the defendant's issues in turn.

### I. Motion to Recuse

The defendant first contends that the trial judge erred by denying his pretrial motion requesting that the trial judge recuse himself from the trial of this case. We disagree.

When a judge's impartiality could reasonably be called into question, the judge should recuse himself. *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). Recusal is appropriate "when a person of ordinary prudence in the judge's position . . . would find a reasonable basis for questioning the judge's impartiality." *Id.* As such, a trial judge addressing a motion for recusal must determine whether he or she has a subjective bias against the defendant and whether the trial judge's impartiality

could reasonably be questioned under an objective standard. *State v. Connors*, 995 S.W.2d 146, 148 (Tenn. Crim. App. 1998). Adverse rulings by a trial court do not, standing alone, establish judicial bias requiring recusal of the trial court. *See, e.g., Herrera v. Herrera*, 944 S.W.2d 379, 397 (Tenn. Ct. App. 1996). The issue of a trial judge's recusal based upon alleged bias or prejudice rests within the sound discretion of the trial court, and this court will not interfere with the lower court's discretion unless clear abuse appears on the face of the record. *Owens v. State*, 13 S.W.3d 742, 757 (Tenn. Crim. App. 1999); *Caruthers v. State*, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991).

At the defendant's bond hearing on May 9, 2014, the trial judge found "a reasonable likelihood of conviction" and noted that the potential of a life sentence plus 25 years "create[d] the inference of a flight risk." Although the trial judge expressed his disagreement with the law that requires the setting of a bond in first degree murder cases, the judge nonetheless followed the law and set the defendant's bond at 10 million dollars:

> And I will put [the defendant] on notice that if he wins the lottery and somebody goes in and says, I'm posting this ten million dollar ($10,000,000) bond, the Court will, in fact, summarily revoke that bond because it is the Court's intention that [the defendant] should be detained pending a disposition of these charges, and I will give [the defendant] the quickest trial date that the lawyers' calendars will accommodate because if [the defendant] says, "Judge Coffee, I'm not guilty of this," it is my intention to get this case tried sooner than later so that [the defendant] can resolve and the State of Tennessee can resolve these issues that traverse between [the defendant] and the State. But this Court will set a bond to cover this indictment at ten million dollars . . . .

Fifteen months later, on the date the defendant's trial was scheduled to begin on August 17, 2015, the defendant filed a motion to recuse on the basis that the trial judge's setting of such a high bond amount, coupled with the judge's comments of revoking that bond should the defendant win the lottery, evinced the trial judge's bias against the defendant. The trial judge denied the defendant's motion, finding it to be untimely filed and ruling that, in any event, he had not prejudged the case and that he would continue "to treat [the defendant] with the same fairness and the same standard that" he treats all others appearing before him.

On appeal, the defendant reiterates his claim that the trial judge's comments regarding the defendant's bond amount evince bias against the defendant; that the trial transcript "is replete with examples of the trial court's apparent animosity toward"

defense counsel; and that trial counsel likely chose to delay the filing of the motion to recuse in the instant case because, one month prior to the defendant's bond hearing, the trial judge had denied motions to recuse filed by trial counsel in two unrelated cases.

First, the defendant has waived our consideration of this issue by failing to raise it in a timely manner. Tennessee Supreme Court Rule 10B provides that a party seeking recusal or disqualification of a judge "shall do so by a timely filed written motion," supported by an affidavit and alleging with specificity the grounds for the motion. Tenn. Sup. Ct. R. 10B § 1.01. "'[R]ecusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality.'" *State v. Antonio Freeman*, No. M2012-02691-CCA-10B-CD, slip op. at 5-6 (Tenn. Crim. App., Nashville, Jan. 15, 2013) (quoting *Duke v. Duke*, 398 S.W.3d 665, 670 (Tenn. Ct. App. 2012)). That the defendant waited 15 months before seeking recusal on the basis of the court's comments at the bond hearing results in waiver of this issue. Furthermore, the defendant's suggested reason for the delay – that trial counsel did not wish to seek recusal so soon after having recusal denied in two unrelated cases – is quite simply an invalid excuse.

In any event, the judge's comments regarding his belief that setting bond is inappropriate in first degree murder cases are not evidence of his bias against the defendant in particular, and the court explained that the likelihood of a conviction and the potential for flight guided his decision in setting the bond amount. The defendant's statement, without argument or citation to the record, that the record was "replete with examples of the trial court's apparent animosity toward" defense counsel avails him nothing. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct. Crim. App. 10(b). Although it is true that the trial court denied, without explanation, defense counsel's request to approach the bench during the early testimony of P.S., the trial court had recently overruled two of defense counsel's objections to the relevance of foundational questions, and the defendant fails to explain to this court the basis of his objection or how the trial court's denial of counsel's request to approach prejudiced him in any way.

In sum, we find no abuse of discretion in the trial court's denial of the defendant's motion to recuse.

## II. *Amendment of Indictment*

Next, the defendant argues that the trial court erred by permitting the State to amend the indictment to expand the temporal scope by one day. We disagree.

- 13 -

"Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced." Tenn. R. Crim. P. 7(b)(2). A trial court's ruling on a motion to amend an indictment is reviewed for an abuse of discretion. *State v. Kennedy*, 10 S.W.3d 280, 283 (Tenn. Crim. App. 1999). "[T]he amendment of the date in an indictment does not charge the defendant with a new or an additional crime." *Id.* at 284 (citations omitted).

Here, the original indictment charged the defendant with committing the respective crimes against the victim "between January 1, 2013 and January 15, 2013." Two weeks prior to trial, the State moved to amend the temporal scope of all counts of the indictment by a single day, changing January 1, 2013 to December 31, 2012. The trial court granted the State's motion. On the first morning of trial, the defense challenged the court's ruling, arguing that the expansion of the temporal scope hindered their ability to prepare a defense and that the State was using this amendment as "a back door way of" admitting Tennessee Rule of Evidence 404(b) evidence of the defendant's prior bad acts. The State responded that the amendment was not based on any new information and was made "out of an abundance of caution," explaining that jurors might believe that any events which occurred on January 1 would not have been included in the scope of the indictment because the charging instrument uses the word "between" to separate the two relevant dates.

The trial court, noting that it had already ruled on this issue, agreed with the State's reasoning that the expansion of the temporal scope would avoid any confusion among jurors as to whether the date of January 1 was actually included within that time frame. With respect to the defendant's argument that the State was attempting to introduce prior bad act evidence through the "back door," the court ruled that any evidence of potential prior bad acts would be handled through an appropriate Rule 404(b) hearing at the relevant time during trial.

Clearly, the State, in seeking to expand the temporal scope of the indictment by a single day, did not alter the offenses charged, and the defendant was in no way prejudiced by this amendment. As such, we find no abuse of discretion in the trial court's decision to permit the State to amend the indictment.

### III. *Evidentiary Issues*

The defendant next contends that the trial court erred by admitting certain evidence at trial. Specifically, the defendant argues that the court erred by admitting into evidence photographs of the victim's internal organs, by permitting Sergeant Quinn to

offer lay opinion testimony regarding a shoe print, and by admitting evidence of prior instances of abuse under Tennessee Rule of Evidence 404(b).

As is pertinent to each of these sub-issues, questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

## *A. Photographs*

"Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). "The general rule . . . is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *Carter*, 114 S.W.3d at 902 (quoting *Banks*, 564 S.W.2d at 950-51). Even relevant photographs may be excluded, however, if their probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Banks*, 564 S.W.2d at 951. "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *State v. Odom*, 336 S.W.3d 541, 565 (Tenn. 2011) (citing *Banks*, 564 S.W.2d at 949).

Here, the State sought to introduce, through the testimony of Doctor Chancellor, a number of autopsy photographs depicting the extent of the victim's injuries.

During a hearing outside the presence of the jury, the defendant objected to the admissibility of the six photographs depicting the damage to the victim's internal organs, arguing that the gruesome nature of the photographs was intended to "shock" and "scare[]" the jurors and that the testimony of Doctor Chancellor would sufficiently establish the victim's internal injuries without the need to supplement that testimony with photographs.

The trial court determined that the photographs at issue were relevant to supplement Doctor Chancellor's testimony about the extent of the victim's internal injuries and were "not particularly horrifying" or "gruesome." The court further found that the probative value of the photographs outweighed any danger of unfair prejudice to the defendant.

Having reviewed the photographs, we conclude that, although graphic, they are not especially gruesome or horrifying. Indeed, the defendant states on appeal that the photographs "are completely unrecognizable or identifiable as internal parts of the human body," which begs the question of how such photographs could be considered inflammatory. Accordingly, the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. The defendant is not entitled to relief on this issue.

### B.       Sergeant Quinn's Testimony

Lay witnesses may give testimony in the form of an opinion when the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). This court has previously held that a witness need not be an expert in "shoe or footprint identification" to testify regarding shoe print analysis because such testimony would be considered "common knowledge." *State v. Anthony Duran Hines*, No. M2007-00493-CCA-R3-CD, slip op. at 2-3 (Tenn. Crim. App., Nashville, May 12, 2008); *see also State v. Billy Tate*, No. E2012-02576-CCA-R3-CD, slip op. at 9-10 (Tenn. Crim. App., Knoxville, Sept. 27, 2013).

Here, Sergeant Quinn opined that the rectangular bruising on the right side of the victim's torso showed a specific pattern that was consistent with the athletic shoes the defendant was wearing at the time of his interview with Sergeant Quinn. Such testimony did not run afoul of Rule 701(a), and the trial court did not abuse its discretion in permitting Sergeant Quinn to offer this lay opinion.

### C. Evidence of Prior Bad Acts

Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). To admit such evidence, the rule specifies four prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

In the instant case, the trial court conducted hearings outside the jury's presence to determine the admissibility of evidence regarding both the January 1 incident, in which the victim was found with a large knot on his forehead, and the 2011 incident, in which the victim was returned to daycare by the defendant with scratches and abrasions on his body. With respect to the January 1 incident, the trial court determined that it did not fall under the purview of Rule 404(b) because the State was not attempting to show that the defendant had caused the victim's head injury. Instead, the evidence was offered both to prove aggravated child neglect and to show that, two weeks prior to his death, the victim was an otherwise healthy child. With respect to the 2011 incident, the court found by clear and convincing evidence that the incident had occurred and that the defendant had opened the door to admission of the evidence by testifying on direct examination about his "dispute" with R.S. and the necessity of having to visit the victim at R.S.'s home. The court further found that the 2011 incident provided "contextual background"

of C.S.'s and R.S.'s concern for the safety of the victim, and it also rebutted the defendant's claim that the victim's injuries were the result of an accident.

In our view, evidence concerning the January 1 incident, including the photograph of an otherwise happy, healthy victim with a knot on his head, was not prohibited by Rule 404(b) because it was not offered to show that the defendant had caused the victim's injury, but such evidence was properly admitted both as evidence of aggravated child neglect and to show the state of the victim's health two weeks prior to his death. Concerning the 2011 incident, although we do not think much of the "contextual background" basis for admission, the defendant undoubtedly opened the door to the introduction of this evidence on cross-examination by mentioning his dispute with R.S. on direct examination, and the probative value of such evidence to show absence of a mistake or accident outweighed any prejudicial impact.

Given the trial court's compliance with the requirements of Rule 404(b), we find no abuse of discretion in the lower court's decision to admit the aforementioned testimony.

## IV. Cumulative Error

Finally, the defendant contends that the cumulative effect of the errors at trial deprived him of the right to a fair trial. Having considered each of the defendant's issues on appeal and concluded that the defendant is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## Conclusion

The defendant has failed to establish entitlement to relief on any of the issues presented. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE